GENE R. PETERS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peters v. Commissioner
Docket No. 734-78.
United States Tax Court
T.C. Memo 1981-83; 1981 Tax Ct. Memo LEXIS 663; 41 T.C.M. (CCH) 955; T.C.M. (RIA) 81083; February 24, 1981. *663 Held, petitioner understated his taxable income for 1972 and 1973. Held further, part of the underpayment of taxes for 1972 and 1973 was due to fraud with intent to evade tax under section 6653(b), I.R.C. 1954. Gene R. Peters, pro se. Roger Osburn, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies and additions to tax in petitioner's Federal income taxes: Section [1] 6653(b)
Year
Deficiencies
Addition to Tax
1972
$ 1,675.11
$ 431.75
1973
9,027.20
4,188.78
The issues for decision are: 1. Whether petitioner had unreported income for 1972 and 1973 as determined by respondent under the source and application of funds *664 method of reconstructing income. 2. Whether any part of petitioner's underpayment of tax for 1972 and 1973 (if any) was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly.
Gene R. Peters (hereinafter petitioner) resided in Apopka, Florida, when he filed his petition in this case. Petitioner and his deceased wife, Elwanda R. Peters (hereinafter Elwanda), filed joint Federal income tax returns for the years 1972 and 1973 with the Office of the Director, Internal Revenue Service Center, Central Region, Cincinnati, Ohio, reporting on the cash method of accounting. In 1953, petitioner and Elwanda purchased a house located at 4041 Brown Street, Flint, Michigan, for $ 8,000. The purchase was financed by a downpayment of $ 2,000 and a mortgage of $ 6,000 payable in monthly installments of $ 60. In 1955, petitioner's father paid off the remaining balance of the mortgage in the amount of $ 5,403.77. Petitioner and his wife resided at 4041 Brown Street until 1963. Between the years 1962 and 1974, petitioner and Elwanda maintained savings accounts at the following banks: Genesee Merchants Bank & Trust Company in Flint, Michigan (hereinafter *665 Genesee), Citizens Commercial & Savings Bank in Durand, Michigan (hereinafter Citizens), Sarasota Federal Savings & Loan Association in Sarasota, Florida (hereinafter Sarasota Federal), and Owosso Savings Bank in Owosso, Michigan (hereinafter Owosso Savings). Petitioner and Elwanda frequently made deposits and withdrawals from those accounts often in small sums such as $ 100. On January 24, 1963, petitioner received $ 1,254.59 from John Hancock Mutual Life Insurance Company reflecting the cash surrender value and accrued dividends on two insurance policies which petitioner had taken out on his children for their college education. The children, however, decided not to attend college. Petitioner deposited this money into the savings account at Genesee on January 29, 1963. In August 1963, petitioner and Elwanda purchased a hotel in Durand, Michigan, for $ 20,000. They used their Flint, Michigan, residence as a downpayment [2] and executed a mortgage for the balance. Monthly mortgage payments were $ 125. Petitioner operated the hotel until July 1967. *666 On December 21, 1965, petitioner received insurance proceeds of $ 838.34 from Metropolitan Life Insurance Company following the death of his mother in November of that year. On July 17, 1967, petitioner and Elwanda sold the hotel in Durand, Michigan, to Thomas Simmington for $ 29,000. Mr. Simmington paid $ 6,000 as a downpayment on July 20, 1967, of which amount petitioner and his wife netted $ 3,280 after paying closing costs. Petitioner and Elwanda financed the balance of the purchase price receiving monthly mortgage payments of $ 300 of which $ 125 per month was used to pay their mortgage indebtedness on the hotel. On July 21, 1967, petitioner deposited $ 3,000 in the savings account at Citizens. On July 19, 1967, petitioner and Elwanda purchased a house located at 1017 Lingle Avenue, Owosso, Michigan, for $ 13,500. They paid $ 1,500 as a downpayment and executed a mortgage to First Federal Savings & Loan Association of Owosso (hereinafter First Federal) in the amount of $ 12,000. Total monthly payments on the house were $ 114. Petitioner and his wife also paid closing costs on the purchase of approximately $ 200. To cover the downpayment and closing costs, petitioner *667 withdrew $ 1,700 from the savings account at Citizens. Following the sale of the hotel in July 1967, petitioner and Elwanda obtained employment as manager and waitress, respectively, with a Kentucky Fried Chicken restaurant in Owosso, Michigan. They were employed in those capacities until early 1969. On April 28, 1969, petitioner and Elwanda sold their residence in Owosso, Michigan, to Orval Owen for $ 17,900. The sale was financed by State Savings Bank. After paying First Federal the balance due on the mortgage principal, petitioner and Elwanda received cash in the amount of $ 5,475.05. On that same date, they deposited $ 6,175.05 in their savings account at Citizens. Subsequent to the sale of their personal residcence in Owosso, petitioner and Elwanda moved to Florida and on June 25, 1969, purchased a house in Sarasota for $ 19,000. They paid $ 1,900 as a downpayment and obtained a mortgage loan of $ 17,100 from Sarasota Federal payable in monthly installments of $ 141. Petitioner had withdrawn $ 6,000 from the savings account at Citizens in May 1969, and used a portion of that money to make the downpayment. In July 1969, petitioner received $ 695.64 from the estate *668 of his deceased father. Shortly thereafter, petitioner and Elwanda moved back to Owosso, Michigan, and on October 21, 1969, repurchased the house at 1017 Lingle Avenue from Orval Owen for $ 17,900. They paid Mr. Owne $ 2,253.40 (consisting of the downpayment and tax adjustment) and assumed his mortgage indebtedness of $ 15,752.60.Petitioner withdrew $ 2,200 from the savings account at Citizens on October 21, 1969, to cover the downpayment on this purchase. In November 1969, petitioner and Elwanda sold their house in Sarasota for $ 20,500. The purchaser paid them $ 3,500 cash and assumed their mortgage indebtedness of$ 17,000. Petitioner and Elwanda paid closing costs on this sale and netted $ 2,179 cash. In December 1969, petitioner deposited $ 1,700 in the savings account at Citizens. In January 1970, petitioner and Elwanda received $ 15,934 from Thomas Simmington in complete satisfaction of his mortgage obligation on the 1967 hotel purchase. Petitioner and Elwanda used $ 6,347 of that amount to pay off their mortgage on the hotel. Also, in January 1970, petitioner received $ 289.12 from the estate of his deceased mother. On June 2, 1970, petitioner deposited $ 9,000 *669 in the savings account at Citizens. On November 27, 1970, petitioner and Elwanda withdrew $ 9,647 from the savings account at Citizens. On November 30, 1970, they made a mortgage payment of $ 9,022.33 on their house at 1017 Lingle Avenue. In August 1971, petitioner and Elwanda borrowed $ 18,000 from First Federal and executed a second mortgage on the house at 1017 Lingle Avenue as security for the loan. Monthly payments on this mortgage were $ 153.38. After paying prepaid finance charges and other expenses, petitioner and Elwanda received net loan proceeds of $ 17,664.45. Of this amount, $ 6,282.24 was then used to pay off their first mortgage on that house. In September 1971, petitioner and Elwanda purchased Al Rohac's Drive-in restaurant in Owosso, Michigan (hereinafter sometimes referred to as the Drive-in) for $ 65,000. They paid $ 11,000 as a downpayment and executed a mortgage of $ 54,000 payable in monthly installments of $ 1,265, including $ 375 monthly land rent. They operated the Drive-in from September 1971 through February 1974. The business was conducted as a family partnership whereby petitioner and Elwanda split the profits equally. Petitioner chose *670 to run the business as a partnership so that both he and his wife could qualify for social security. The Drive-in was repossessed in February 1974, at which time petitioner and Elwanda again moved to Florida. Elwanda died in January 1976. During 1972 and 1973, petitioner and Elwanda maintained certain books and records of the Drive-in and filed partnership returns of income. Petitioner signed those returns in his capacity as a partner. During those years, petitioner and his wife also maintained a personal draw account for the partnership (hereinafter referred to as the Partnership draw) in which they deposited some receipts from the operation of the Drive-in and from which they issued checks for various expenditures. For the years 1972 and 1973, the partnership returns of income filed by petitioner and Elwanda reflected the following: 1972
1973
GrossReceipts
$ 141,956.38
$ 170,044
Cost of goods sold
61,938.34
84,708
Gross profit
80,018.04
85,336
Other income
1,518.47
571
Total deductions (salaries, land
rent, taxes, etc.)
63,911.18
61,733
Ordinary income
$ 17,625.33
$ 24,174
During the years at issue, petitioner received payments *671 from the sale of used grease and kickbacks from dairy and bread suppliers totaling approximately $ 200 per month. Petitioner did not report these payments as income on his joint returns for those years. On June 25, 1973, petitioner and Elwanda purchased a house located at 430 East North Street, Owosso, Michigan, for $ 27,900. They paid $ 6,000 as a downpayment and obtained a mortgage for the balance. On October 31, 1973, Elwanda withdrew $ 9,241.84 from the savings account at Owosso Savings. On that same date, Elwanda paid off the principal balance and accrued interest on the mortgage at 430 East North Street in the amounts of $ 22,208.31 and $ 30.53, respectively. During the years 1972 and 1973, petitioner and Elwanda made expenditures of $ 8,698.10 and $ 13,253.43, respectively, for the following personal living expenses: 1972
1973
Medical expenses
$ 740.00
$ 402.00
Gasoline
480.00
800.00
Charitable contributions
104.00
156.00
Meals
1,200.00
1,200.00
Recreation, entertainment, etc.
1,000.00
1,000.00
Vacation
750.00
Utilities
480.00
480.00
Miscellaneous living expenses
3,944.10
9,215.43
Total living expenses
$ 8,698.10
$ 13,253.43
*672 Checks were issued from the Partnership draw to pay medical expenses of $ 300 in 1972 and the miscellaneous living expenses in both 1972 and 1973. The remaining living expenses were not paid from either the Partnership draw or from savings accounts. During the years at issue, no checks were written on the Partnership draw payable to either petitioner, Elwanda or to cash. Beginning in the mid-1960's and continuing throughout the years at issue, petitioner obtained several small loans from State Savings Bank of Owosso, Michigan, to purchase automobiles, a television, radio, water conditioner and other consumer items. On their joint income tax returns for the years 1963 through 1971, petitioner and Elwanda reported gross income and itemized deductions in the following amounts: Year
Gross Income
Itemized Deductions
1963
$ 3,611.75
$ 825.36
1964
3,044.87
0
1965
4,211.49
892.00
1966
3,826.76
742.79
1967
4,340.92
1,263.47
1968
[3]
[3]
1969
8,066.67
2,721.71
1970
8,867.00
4,346.00
1971
10,725.00
3,817.00
The Internal Revenue Service investigated petitioner's tax liability *673 for the years 1972 and 1973. During an examination of petitioner's books and records, including the Partnership draw, revenue agent Michael Lowe discovered substantial expenditures for various personal living expenses, automobile payments, contributions to partnership capital and loan repayments for which there was no apparent source. He also found unexplained deposits to petitioner's savings account at Owosso Savings. When questioned by Agent Lowe about his findings, petitioner responded that Elwanda had accumulated a cash hoard over several years, unknown to him prior to October 1973, which was used as a source for the unexplained expenditures and deposits. Petitioner also stated that he used the payments he received from the sale of used grease and kickbacks for some of his living expenses. In his notice of deficiency, respondent determined petitioner's taxable income for 1972 and 1973 usingthe source and application of funds method of reconstructing income as set forth below: Application of Funds
1972
1973
Personal living expenses
$ 8,698.10
$ 13,253.43
Payments on 1017 Lingle Avenue property
2,212.56
2,240.76
Savings deposits (net)
1,024.05
Purchase of North Street property
28,400.00
Payments on water softener
117.48
9.71
Payments on 1972 Chevrolet: Downpayment
2,690.00
Monthly payments
551.18
1,811.02
Estimated tax payments
1,900.00
2,000.00
*674 Application of Funds
1972
1973
Tax paid when income tax return filed: 1971 return
$ 866.64
$
1972 return
1,122.14
Contribution to Partnership
5,464.49
Payments on 1969 Oldsmobile
2,407.29
Total application of funds
$ 20,467.30
$ 54,301.55
Source of Funds
1972
1973
Withdrawals from Partnership
$ 13,241.25
$ 23,903.44
Interest income
260.00
300.00
Savings withdrawals (net)
4,954.97
Depreciation per partnership return
4,065.95
4,100.00
Total source of funds
$ 17,567.20
$ 33,258.41
Total application of funds
$ 20,467.30
$ 54,301.55
Less: Total source of funds
17,567.20
33,258.41
Unreported taxable income
$ 2,900.10
$ 21,043.14
Respondent also determined that the underpayment of tax for those years was due to fraud and asserted additions to tax under section 6653(b). ULTIMATE FINDINGS OF FACT 1. Petitioner had unreported taxable income for 1972 and 1973 in the amounts of $ 2,900.10 and $ 21,043.14, respectively. 2. Petitioner's underpayment of taxes for each of the years at issue was due to fraud with intent to evade tax. OPINION Issue 1: Unreported Income
The first issue for decision *675 is whether petitioner had unreported income in 1972 and 1973 as determined by respondent using the source and application of funds method. This method of income reconstruction has long been accepted by this Court, Vassallo v. Commissioner, 23 T.C. 656 (1955), and is based on the assumption that the amount by which a taxpayer's application of funds during a taxable period exceeds his known source of funds for the same period is taxable income, absent some explanation by the taxpayer. See Taglianetti v. United States, 398 F. 2d 558, 562 (1st Cir. 1968), affd. 394 U.S. 316 (1969). As explanation, the taxpayer may show that the excess is attributable to nontaxable items such as loans, gifts, inheritances, or other assets on hand at the beginning of the taxable period. Respondent's determination under this method is presumptively correct and the petitioner has the burden of proving this determination wrong. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
In the instant case, petitioner does not challenge respondent's use of the source and application of funds method to *676 determine his income for the years at issue. Indeed, he has stipulated to the correctness of respondent's calculations under this method, as set forth in our findings of fact, with one notable exception. Petitioner contends that respondent failed to include in his source of funds computation a cash hoard accumulated by Elwanda prior to 1972 and hidden in a safe at their house. He claims that Elwanda first informed him of this hoard in October 1973, when she paid off the mortgage on their house at 430 East North Street in one lump sum. According to petitioner, Elwanda accumulated this hoard from various sources including their joint earnings, the numerous real estate sales prior to the years in issue, and the payments received on insurance policies and from the estates of petitioner's parents. He further maintains that his wife was able to save additional money because they had no mortgage payments on their house in Flint, Michigan, from 1955 through 1962, they ate most of their meals during 1968 and 1969 at a Kentucky Fried Chicken restaurant free of charge, and they lived frugally throughout their marriage. Respondent, on the other hand, disputes petitioner's assertions of *677 a secret cash hoard and contends that the unexplained expenditures and bank deposits during the years at issue were made with unreported income skimmed from the operation of the Drive-in. For the reasons stated below, we agree with and hold for respondent. The record in this case totally fails to support petitioner's cash hoard theory. Although petitioner claims that Elwanda was able to amass a substantial cash hoard at the end of 1971, in part, from their earnings and frugal lifestyle, the facts belie this contention. Petitioner's income tax returns for the years 1963 through 1967 and 1969 through 1971 reflect total gross income of approximately $ 47,000 and total itemized deductions of approximately $ 15,000. While there is no evidence with respect to personal living expenses and other nondeductible expenditures in those years, we are convinced that Elwanda could not have accumulated any cash savings out of those minimal earnings even assuming that they lived frugally. [4] See Viles v. Commissioner, 233 F.2d 376 (6th Cir. 1956), affirming a Memorandum Opinion of this Court. *678 An examination of the real estate transactions prior to the years at issue also fails to support the existence of any cash accumulation. As disclosed by our findings of fact, most of the cash received by petitioner and Elwanda from those sales was deposited almost immediately into their savings account at Citizens. A portion thereof was later withdrawn in order to make downpayments on additional real estate purchases. While some small amounts of cash were not deposited in the bank, we believe such amounts were likely used for moving and other personal expenses and not hidden by Elwanda in a safe at their house. Similarly, we cannot accept petitioner's contention that the insurance and estate proceeds were a source for the alleged cash hoard. The record shows that petitioner deposited the entire $ 1,254.59 payment from John Hancock Mutual Life Insurance Company in his savings account at Genesee. The other insurance and estate payments, totalling approximately $ 1,800 were received by petitioner from 1965 to 1970 and there is no evidence that any amounts thereof remained unexpended as of 1972. Moreover, even if such amounts were still available during the years in question, *679 we are unable to find on this record that Elwanda had any control over them. Other factors in this record further weaken petitioner's cash hoard argument. Our findings reveal that petitioner had a history of borrowing small amounts of money to purchase various consumer items. In our view, it is highly improbable that Elwanda would have been hoarding money at the same time that petitioner was borrowing for such purposes. See Cefalu v. Commissioner, 276 F. 2d 122 (5th Cir. 1960), affirming a Memorandum Opinion of this Court. In addition, we note that petitioner and his wife made numerous withdrawals from their savings accounts over the years often in small amounts such as $ 100. Some of these funds were then used as downpayments for various real estate purchases while the smaller withdrawals were apparently used for living expenses. This frequent use of savings accounts is plainly inconsistent with petitioner's claim that Elwanda had large sums of cash readily available at home. See Conway v. United States, 168 F. Supp. 656, 659 (D. Mass. 1958), affd. 278 F. 2d 710 (1st Cir. 1960). Furthermore, petitioner's testimony concerning *680 the alleged cash hoard was simply not credible. Petitioner stated at trial that his wife hoarded the money at home because she did not believe in banks. Yet, the fact that she maintained savings accounts at several banks over a period of fourteen years certainly discredits this explanation. Petitioner also testified that he did not know of the hidden accumulation until October 1973 when Elwanda used a portion thereof to pay off their house in Owosso, Michigan. The record shows, however, that petitioner made expenditures for personal living expenses during the years at issue which are not traceable to checks written on the Partnership draw or to withdrawals from the savings accounts. If, as petitioner claims, these expenditures had their source in a secret cashhoard, how could he have used such money for daily living expenses during 1972 and 1973 when he only first learned of its existence in late 1973? In light of these and other inconsistencies in petitioner's testimony, we are convinced that his self-serving assertions of a cash hoard are unworthy of belief. Moreover, on this record, we are convinced that the excess application of funds determined by respondent in his reconstruction *681 was attributable to diverted receipts from the restaurant. Our findings of fact reveal that during 1972 and 1973, petitioner derived his livelihood from the operations of Al Rohac's Drive-in restaurant which he purchased in 1971.Petitioner conducted this business through a family partnership with Elwanda and the partnership returns for those two years reflect gross profit of $ 80,018.04 and $ 85,336, respectively. While we recognize that the restaurant had substantial operating expenses, these large gross profit figures represent the opportunity for petitioner to siphon off funds. This is particularly true when we consider that drive-in restaurants deal most exclusively in cash. Furthermore, the fact that petitioner failed to report as income the monthly payments he received on the sale of used grease and on kickbacks from bread and milk suppliers, leads us to believe that he was not concerned about extracting unreported cash from his business. Finally, we note that revenue agent Lowe testified that petitioner told him during his audit that all receipts from the restaurant were deposited in the Partnership draw. However, since we have found that petitioner made expenditures during *682 the years at issue which did not have their source in either the Partnership draw, savings accounts, or a secret cash hoard, we think the conclusion inescapable that petitioner skimmed unreported cash from the operation of his business. Accordingly, on the basis of the record before us, we hold that there was no cash hoard and that petitioner had unreported income in the amounts determined by respondent. Issue 2: Fraud
The second issue for decision is whether any part of petitioner's underpaymentof taxes for 1972 and 1973 was due to fraud with intent to evade tax under section 6653(b). The existence of fraud is a question of fact to be determined upon consideration of the entire record. Stratton v. Commissioner, 54 T.C. 255, 284 (1970). Respondent has the burden of proving fraud and he must establish it for each taxable year involved by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner, 276 F. 2d 122 (5th Cir. 1960). To establish fraud, respondent must show that the taxpayer acted with the specific intent to evade a tax believed to be owing. Mitchell v. Commissioner, 118 F. 2d 308, 310 (5th Cir. 1941). *683 Since direct evidence of fraudulent intent is seldom available, respondent may meet his burden of proof with circumstantial evidence. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Such evidence includes conduct calculated to mislead or conceal. Gajewski v. Commissioner, 67 T.C. 181, 200 (1976). For the reasons stated below, we conclude that respondent has carried his burden of proof here. First, we affirmatively found that petitioner failed to report large amounts of income from his business in each of the years at issue. While such repeated understatements of income may not be sufficient to establish fraud, Marinzulich v. Commissioner, 31 T.C. 487, 490 (1958), they certainly constitute evidence of fraudulent intent, particularly in light of petitioner's patently weak assertion of a secret cash hoard. See Stone v. Commissioner, supra at 225. Second, petitioner's failure to report the payments he received from kickbacks and from the sale of used grease is another indicia of fraud. The record shows that petitioner was an experienced businessman having operated a hotel and managed a restaurant prior *684 to the years involved herein. Certainly, he must have known that these payments were taxable. Moreover, his failure to report the income was not due to mere inadvertence or even negligence because these were recurring payments which he received each month. At trial, petitioner attempted to explain his actions by stating that the omitted amounts were expended for repairs on the Drive-in which he did not claim as deductions, thus "washing out" the unreported receipts. Petitioner failed, however, to offer any proof that the omitted payments were so expended. Even more significant, petitioner did not make this claim during the course of the audit. In fact, he specifically told the revenue agent at that time that he used these payments for his living expenses. Under these circumstances, we think petitioner's statements at trial were made with the purpose of misleading this Court as to the extent of his understatement and is further evidence of fraudulent intent. Finally, we are convinced that the manner in which petitioner handled his business transactions during these years also supports a finding of fraud. As previously noted, we have found that the understatements of income *685 were attributable to petitioner's diversion of cash from the operations of his restaurant. From an examination of the record, it is clear that he did not deposit the unreported cash in the Partnership draw, as he did with other business receipts, but instead used it for personal living expenses, thereby making it more difficult to discover the omitted income. Moreover, since petitioner kept the books and records for the Drive-in and filed partnership returns, we believe that his failure to make those deposits and report them as income on the returns was with the specific intent to evade the tax he knew was owing on such amounts. In sum, we conclude that respondent has shown by clear and convincing evidence that all or part of petitioner's underpayment of tax was due to fraud. Accordingly, respondent's imposition of the section 6653(b) addition to tax is sustained. To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. Statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. The house at 4041 Brown Street was valued by the seller at $ 9,500 and was then encumberedby a mortgage of $ 1,969.37. Accordingly, petitioner's equity in the house of $ 7,530.63 was used as the amount of the downpayment.↩
3. The record does not contain the joint return for 1968.↩
4. Petitioner offered no evidence at trial with respect to their alleged frugal lifestyle. On brief, however, he attempted to present additional proof to support this claim. Since this purported evidence was not presented at trial, it cannot be considered herein. Rule 143(b), Tax Court Rules of Practice and Procedure; see Kwong v. Commissioner,65 T.C. 959, 967, n. 11 (1976); Perkins v. Commissioner, 40 T.C. 330, 340↩ (1963).