**Clinton D. TUCKER, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 619–82T.

United States Claims Court.

May 10, 1985.

See also 7 Cl.Ct. 374.

E. John Eagleton, Tulsa, Okl., for plaintiff.

David C. Hickman, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

This individual income tax refund suit stems from a Notice of Jeopardy Assessment and Right of Appeal issued on May 4, 1981, by the District Director of Internal Revenue, Oklahoma City, Oklahoma, to plaintiff herein, Clinton David Tucker, for unpaid income taxes, penalties, and interest for the calendar years 1979 and 1980 in the total amount of $272,147.97.[1] The civil fraud penalties were imposed by the District Director pursuant to 26 U.S.C. § 6653(b) upon his determination that there was probative evidence to the effect that Mr. Tucker intended to fraudulently evade his individual income taxes in 1979 and 1980. Specifically, defendant seized through the jeopardy assessment $272,-147.97 from plaintiff in satisfaction of the following alleged unpaid obligations owed to the Internal Revenue Service:

| Item | 1979 | 1980 | Total |
|---|---|---|---|
| Tax liability | $5,781.00 | $174,438.00 | $180,219.00 |
| Penalty (50%) | 2,891.00 | 87,219.00 | 90,110.00 |
| Interest | 729.33 | 1,089.64 | 1,818.97 |
| Total | $9,401.33 | $262,746.64 | $272,147.97 |

At the trial on the merits of plaintiff's claim, he continued to seek a refund of the entire amount ($272,147.97) seized by the IRS as a result of the execution of the jeopardy assessment. The defendant, however, as a result of the trial, has modified its original deficiency determination of income taxes for 1979 up to $7,120 from

---

1. On October 22, 1981, plaintiff timely filed an income tax refund claim in the amounts of $9,401.33 and $262,746.64 for the taxable years 1979 and 1980, respectively, with the District Director of the Internal Revenue, Oklahoma City, Oklahoma. Plaintiff did not receive a Notice of Disallowance from the Internal Revenue Service within six months of his filed claim for refund for 1979 and 1980. Suit was therefore filed in this court on January 3, 1983, and amended thereafter on January 19, 1983, as provided by § 6532(a)(1), Title 26 U.S.C.

$5,781, and down to $68,529 from $174,438 for 1980, plus the appropriate civil fraud penalty and interest. Thus, this suit not only concerns a taxpayer's request for an income tax refund, but it also embraces the question of whether the plaintiff specifically intended to fraudulently evade such taxes respecting the taxable years 1979 and 1980. Jurisdiction of this action is premised upon §§ 1491 and 1346, Title 28 U.S.C.

The threshold issues presented are threefold:

(1) Whether the Commissioner's jeopardy deficiency assessment was arbitrary and capricious so as to obviate entitlement to the presumption of correctness?

(2) If the Commissioner's deficiency assessment is entitled to the presumption of correctness, has the plaintiff met his burden of proving, by a preponderance of the credible evidence, that the deficiency assessment was erroneous and he is therefore entitled to a full refund as claimed? And,

(3) If the plaintiff did in fact underpay his income taxes for the taxable years 1979 and/or 1980, has the defendant met its burden of proof, *i.e.* by clear and convincing evidence, that the plaintiff fraudulently intended to evade his individual income taxes for one or both of those years, entitling the Commissioner to assess appropriate penalties under 26 U.S.C. § 6653(b)?

For the reasons expressed hereinafter, the court concludes that the Commissioner's assessment was neither arbitrary nor capricious and is therefore entitled to the presumption of correctness; that the plaintiff has failed to meet his burden of proof that the jeopardy deficiency assessment was incorrect with respect to certain items; and, finally, that the defendant has met its burden of proof, *i.e.*, by clear and convincing evidence, that the plaintiff specifically intended to fraudulently evade his income taxes for each of the taxable years 1979 and 1980 upon which appropriate penalties may be assessed.

## FACTS

The following background facts, found pursuant to RUSCC 52(a), are either proposed by the plaintiff without objection by the defendant, or are specifically found by the court.

Plaintiff, Clinton D. Tucker, also known as Tommy Tucker, is a high school graduate and was an officer in the Naval Air Corp during World War II. In 1958, Mr. Tucker purchased a house, which he subsequently converted into a restaurant supper club known as Tommy's Continental, which was located at 7030 South Lewis, Tulsa, Oklahoma. The restaurant was operated strictly as a supper club in that it served neither breakfast nor lunch.

Beginning in 1958, plaintiff, and later his wife, lived in the restaurant through August 1980 and during said period subsisted primarily from the food prepared in connection with the operation of the restaurant. Throughout the period of time that plaintiff maintained his supper club, he operated it exclusively with cash. That is, generally, he accepted only cash from his customers, except in rare instances when he would take a check, and he regularly paid his suppliers with cash unless he negotiated a customer's check to a creditor in payment of an account. Additionally, the plaintiff maintained no bank checking account(s) in which to deposit receipts from his restaurant business or by which he would pay operating expenses. Moreover, plaintiff failed to maintain books and records, as required by § 6001, Title 26 U.S.C., and to record therein the receipts and expenses from the operation of the restaurant business.

In late 1969 or early 1970, plaintiff received a cash distribution from the estate of his mother, Margaret Tucker, in the amount of $23,634.98. This amount was remitted to plaintiff in the form of a check from his brother, Mr. William F. Tucker, who was a co-executor of the estate of Margaret Tucker. Plaintiff cashed this check at the Fourth National Bank of Tulsa, Oklahoma, receiving virtually the entire amount in $100.00 bills.

In 1979, the first tax year in issue in this litigation, plaintiff executed a promissory note to Fox Henderson, dated May 4, 1979, in the sum of $80,000.00 at a stated interest rate of 8% per annum due in one year. Following the execution of this note, Mr. Fox Henderson negotiated and cashed six cashier's checks to his order in the total amount of $80,000 at the Republic National Bank in Tulsa, Oklahoma. The cashier's checks were processed by the bank on Monday, May 7, 1979, for the reason that the transaction occurred after 2:00 p.m. on Friday, May 4, 1979.

In June, 1979, about a month *after* plaintiff executed the promissory note of $80,-000, *supra*, he became acquainted with one Carlos DeMello. Upon meeting Mr. DeMello, at a dinner party at plaintiff's supper club in celebration of DeMello's wedding, plaintiff expressed an interest in pursuing business opportunities in the Caribbean. Mr. DeMello was currently residing on the island of Anguilla, British West Indies, and during the dinner party invited plaintiff and his wife to be his guests on the island. Thereafter, in September 1979, plaintiff and his wife traveled to the island of Anguilla and accepted the hospitality of Mr. DeMello for two or three weeks. During this visit, plaintiff and Mr. DeMello decided to jointly undertake a fishing venture by using an existing Anguillan company known as Anguilla Sea Products, Ltd.

Desirous of facilitating the business of Anguilla Sea Products, plaintiff, in September, 1979, established an Anguillan entity known as Merit Leasing, Ltd. This company was originally established to permit plaintiff, an alien, to conduct a boat leasing business with respect to which it would lease certain boats to Anguilla Sea Products on the island of Anguilla. However, the business concept originally envisioned by plaintiff and Mr. DeMello in the fall of 1979 was subsequently changed in or about November, 1979, to the extent that Merit Leasing, Ltd. never became a viable, operating entity. Instead, it ended up owning the stock of Anguilla Sea Products (Tr. 39–40, 171). Indeed, for the pertinent period herein, Merit Leasing, Ltd. never acted in any capacity other than as the alter ego of plaintiff in that it provided plaintiff with a bank account, outside of the United States, through which he conducted his personal activities on the island of Anguilla.

However, in order to expand the fishing operations of Anguilla Sea Products, it was agreed by plaintiff and Mr. DeMello that the former would provide the necessary funds with which to commence business operations. Accordingly, from late September 1979, through to September 1980, plaintiff transferred thousands of dollars from Oklahoma through a bank in Miami, Florida, to Anguilla to finance the Anguillan fishing venture. It is, for the most part, the source of these funds (*i.e.*, taxable or non-taxable) that is the gravamen of this tax refund suit.

With respect to the expenditures in issue, during the taxable year 1979, plaintiff transferred $28,986.20 to Anguilla for investment, which defendant contends represents taxable income for that year, and the court so finds. Conversely, plaintiff contends that a preponderance of the evidence shows that said funds have a non-taxable source, and therefore are not taxable. The $28,986.20 expended emanates from four transactions. First, on September 28, 1979, plaintiff, acting through his alter ego, Merit Leasing, Ltd., purchased a cashier's check from the United Bank, Tulsa, Oklahoma, payable to Anguilla Sea Products, Ltd. in the amount of $9,500.00. Second, on the same day and again through Merit Leasing, Ltd., plaintiff purchased another cashier's check from Woodland Bank, Tulsa, Oklahoma, also payable to Anguilla Sea Products, Ltd. in the amount of $9,500.00. Both of these checks were sent to Mr. DeMello at the Iranian National Bank in New York, New York. Two months later, plaintiff, acting through his alter ego, Merit Leasing, Ltd., made a third transfer by telegraphing on November 27, 1979, a deposit of $4,993.10 into the account of Anguilla Sea Products, Ltd., at the Bank of America in Anguilla. Then, on December 14, 1979, plaintiff telegraphically transferred the fourth transaction whereby,

through the use of Merit Leasing, Ltd., he deposited another $4,993.10 into the account of Anguilla Sea Products at the Bank of America in Anguilla. (Plaintiff admitted that Merit Leasing served no business purpose and all funds transferred through Merit Leasing to Mr. DeMello and Anguilla Sea Products were totally plaintiff's monies.) (Tr. 165–170.)

Similarly, the defendant contends, and the court so finds, that during the taxable year 1980 plaintiff also incurred investment expenditures that represent unreported taxable income in the amount of $94,390.00, in addition to receiving certain miscellaneous interest income of $1,107.38, and income in the amount of $60,000 in United States currency contained in an attache case, as allegedly admitted to Mr. DeMello. (See Attachment A.) As was contended with respect to the 1979 expenditures, plaintiff also avers that the 1980 expenditures stem from a non-taxable source; with respect to the income of $60,000 cash in the attache case, plaintiff simply asserts a categorical denial; and with respect to the interest income, plaintiff says naught.

In early January, 1980, plaintiff went to the island of Anguilla for approximately two weeks to discuss with Mr. DeMello the status of the business of Anguilla Sea Products, Ltd. As the plaintiff and Mr. DeMello were contemplating the purchase of a large fishing vessel, plaintiff took with him to Anguilla approximately $20,000.00 *in cash*. Upon reaching Anguilla, the plaintiff and Mr. DeMello decided not to purchase a boat at that time. Instead, plaintiff invested the $20,000.00 in a Certificate of Deposit at the Bank of America in Anguilla using Merit Leasing's name.

Later in January, 1980, and after plaintiff had returned to Tulsa, Oklahoma, from Anguilla, he wire transferred on three separate occasions $9,999.00 on January 23, 24, and 25, from the First National Bank and Trust Company of Tulsa to the City National Bank of Miami, Florida, in care of Carlos DeMello. This money, $29,997.00 in total, was forwarded to Mr. DeMello, who was then in Miami, to finance the purchase of a boat located in Florida which was to be sailed to Anguilla in working condition. A couple of weeks later, on February 14, 1980, plaintiff wire transferred an additional $7,000.00 from the First National Bank and Trust Company of Tulsa to the City National Bank of Miami, Florida, care of Carlos DeMello. The purpose of this transfer was to finance the purchase of fishing equipment for the boat previously purchased in January, 1980.

Thereafter, in April 1980, Mr. Tucker went to Anguilla to check on the operation of Anguilla Sea Products, Ltd. While in Anguilla, plaintiff stayed with Mr. DeMello, who informed plaintiff that additional operating capital was needed for the fishing business. As plaintiff did not have funds available at that time to advance to Mr. DeMello, plaintiff and Mr. DeMello borrowed $15,000.00 from the Bank of America in Anguilla which was placed into Anguilla Sea Products, Ltd. as operating capital. Additionally, in June 1980, plaintiff and Mr. DeMello borrowed another $10,000.00 from the Caribbean Commercial Bank of Anguilla for further operating capital to maintain Anguilla Sea Products. The vessel purchased in January, 1980, was used as security for the loan.

Shortly thereafter, and during the summer of 1980, Mr. DeMello located a second fishing vessel which he sought to purchase with plaintiff for Anguilla Sea Products, Ltd. In that connection, the plaintiff, on July 14, 1980, wire transferred another $8,000 from the First National Bank and Trust Company of Tulsa to the City National Bank of Miami, Florida, care of Carlos DeMello, to purchase an engine for the second boat. And, in addition, on August 14, 1980, plaintiff wired $12,000 to Mr. DeMello to complete the refitting of the second boat. A week later, on August 21, 1980, Mr. Tucker again wire transferred $7,000 to the City National Bank of Miami, care of Carlos DeMello, this time to finance repairs of the engine of the boat purchased in January, 1980.

A couple of months prior to the foregoing, however, in June 1980, plaintiff de-

cided to move to the island of Anguilla on a permanent basis to take an active part in the management of Anguilla Sea Products. To effectuate this move, plaintiff decided to close and sell his supper club. In anticipation of closing his establishment, plaintiff, in July or August 1980, sold various assets including, but not limited to, a grand piano, kitchen equipment, chairs, a phone booth and other inventory for cash. And, it was about this time in 1980 that plaintiff purchased an AMC jeep in Tulsa for $8,500.

Also during July, 1980, Mr. DeMello offered plaintiff an opportunity to acquire a $100,000.00 certificate of deposit from the Agrindustrial Bank of Commerce, Ltd., in Costa Rica bearing a due date of June 2, 1981, at a bargain. The certificate of deposit was given to plaintiff by Mr. DeMello under an agreement between them whereby in exchange for a $50,000 advance to Mr. DeMello from plaintiff, DeMello would pledge to plaintiff the certificate of deposit. Plaintiff in turn borrowed $75,000 from his brother-in-law, Mr. C.H. Colpitt, from which he funded the $50,000 advance. Such loan was supported by two promissory notes [2] both dated August 20, 1980, given to Mr. Colpitt by plaintiff, in the amount of $50,000.00 and $25,000.00, respectively. The funds were transmitted by two checks in the same respective amounts, containing the same date and both of which were made payable to C.D. Tucker and were drawn by C.H. Colpitt.

Subsequent to the foregoing, plaintiff cashed (endorsed) the two checks to his order which represented the $75,000.00 loan from Mr. Colpitt, at the Union National Bank, the drawee bank of the two aforementioned checks. Concomitantly therewith, Mr. Tucker converted the $75,000 cash into eight cashier's checks, also to his order. Of the eight cashier's checks, seven were drawn bearing a face amount of $9,999.00, and the remaining check was in the amount of $5,000.00. However, these cashier's checks reflected C.H. Colpitt

Prod. Co. as purchaser and C.D. Tucker as payee.

On or about September 3, 1980, plaintiff moved to the island of Anguilla on a permanent basis. When he moved, plaintiff took with him to Anguilla the eight cashier's checks totalling to $74,993.00. Upon reaching Anguilla, plaintiff gave Mr. DeMello five of the $9,999.00 cashier's checks, or approximately $50,000.00, pursuant to plaintiff's and Mr. DeMello's agreement, *supra*, regarding the $100,000.00 certificate of deposit drawn on the Agrindustrial Bank of Commerce, Ltd., which Mr. DeMello had pledged to plaintiff in exchange for an advance of $50,000. Additionally, on September 9, 1980, plaintiff deposited one cashier's check in the amount of $9,999.00 in the bank account of Anguilla Sea Products. A few days later, on September 16, 1980, plaintiff deposited $16,899.00 into the bank account of Merit Leasing, Ltd. This $16,899.00 deposit was comprised of the two remaining cashier's checks that emanated from the Colpitt loan, $9,999.00 and $5,000.00, respectively, and additional cash amounting to $1,899.00 that Mr. Tucker brought with him from Oklahoma.

Later, during the fall of 1980, plaintiff became concerned about the efficacy of the $100,000 certificate of deposit which had been pledged to him by Mr. DeMello to secure the $50,000 advance. Following a confrontation with Mr. DeMello during which Mr. DeMello attempted to convince plaintiff of the validity of the certificate of deposit, plaintiff attempted to place Anguilla Sea Products in the hands of a receiver under Anguillan law. Because plaintiff was unable to accomplish this objective, ultimately, he was forced to institute legal action in February or March of 1981 against Mr. DeMello on the island of St. Kitts-Nevis in order to recover amounts owed to him on both the certificate of deposit and a promissory note for $30,563.50, which was then due, that Mr. DeMello had previously given him on April 8, 1980.

---

**2.** The two notes were unsigned and were offered and received into evidence without objec-

tions from the defendant.

This note purported to represent Mr. De-Mello's investment in Anguilla Sea Products Ltd. As a result of plaintiff's filing this action, Mr. DeMello was caused to be incarcerated for a short period of time in St. Kitts-Nevis, and was only released when plaintiff did not post a prosecution bond of $20,000.00 that was required of all aliens filing legal matters on the island of St. Kitts-Nevis.

On or about November 12, 1980, the $20,-000.00 certificate of deposit that was originally purchased in January, 1980, was converted into cash by Mr. Tucker. The conversion to cash of the certificate of deposit yielded interest earnings in the amount of $1,107.38 into his Merit Leasing, Ltd. bank account at the Bank of America and subsequently deposited the $20,000.00 principal into the same account on November 17, 1980. In March of 1981, plaintiff moved back to Tulsa, Oklahoma, and a few months later, in July 1981, he sold his restaurant which yielded a gross sales price of $550,000. Plaintiff utilized a small portion of those proceeds and repaid, by cashier's check dated July 18, 1981, Mr. C.H. Colpitt $50,000.00 of the outstanding $75,000.00 loan originally made on August 20, 1980 (as evidenced by the Purchaser's Copy). There was also offered and received in evidence a Purchaser's Copy of a cashier's check dated July 17, 1981, purporting to evidence that plaintiff paid Mr. Fox Henderson $30,000.00, discussed *infra*.

During the years starting from 1965 through 1980, Mr. Tucker did not file a federal income tax return (Joint Exhibit 1). With regard to the years 1965 through 1978, he also stipulated that he did not file a tax return despite the fact that he had sufficient gross income requiring him to file. Moreover, plaintiff stipulated that during the years 1970 through 1980, he did not maintain any bank accounts in which he deposited receipts from his business or from which he paid his business expenses.

## DISCUSSION

Plaintiff strenuously contends that he has proven, by a preponderance of the evi-

dence, that he had no taxable income for 1979 and only $20,849 in taxable income for 1980. Incongruent though it may be, he further contends, *inter alia*, that he is entitled to a full refund of $272,149.97 of assessed taxes, penalties, and interest because the defendant's jeopardy deficiency assessment was arbitrary and capricious and thus not entitled to the presumption of correctness. Also, the plaintiff argues that the defendant has not proven, by clear and convincing evidence, that plaintiff fraudulently intended to evade his income taxes, for the years in issue to the extent that the defendant would be entitled to impose the 50% fraud penalty pursuant to 26 U.S.C. § 6653(b). On the other hand, the defendant argues, *inter alia*, that the deficiency assessment is entitled to a presumption of correctness, and that plaintiff has failed to carry his burden and prove, by a preponderance of the evidence, that his 1979 and 1980 expended funds emanated solely from nontaxable sources. Additionally, the defendant avers that there is no doubt that the record shows, by clear and convincing evidence, that the plaintiff fraudulently intended to evade by underpaying his individual income taxes for the taxable years 1979 and 1980. The court will address each of the three main issues seriatim.

*Deficiency Assessment—Entitlement To The Presumption Of Correctness*

■ It is well settled that the Commissioner's deficiency determination has the support of the presumption of correctness which obtains unless or until it is overcome by credible evidence. Consequently, in a tax refund suit the taxpayer has both the burden of proving, by a preponderance of the evidence, that the deficiency is incorrect, and the correct amount of the refund to which he is entitled to recover. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976); *Carson v. United States*, 560 F.2d 693, 695–696 (5th Cir. 1977).

However, in cases involving alleged illegal income activity upon which plaintiff

relies, and which this is not, the Commissioner has not been permitted to rely on this presumption of correctness where he has not been able to proffer any substantive evidence that directly links the taxpayer to the specific tax-generating activity from which the disputed taxable income was derived and upon which the notice of deficiency was based. It is reasoned that absent such direct substantive evidence, the assessment is naked and without a rational basis. *Gerardo v. C.I.R.*, 552 F.2d 549, 553 (3d Cir.1977).

The Second Circuit held, for example, in *Llorente v. C.I.R.*, 649 F.2d 152 (2d Cir. 1981), cited to by plaintiff, that the presumption of correctness evaporated when the Commissioner assessed the taxpayer income taxes based on an allegation that the taxpayer spent money to purchase cocaine, but there was no evidence to support an inference that the taxpayer actually received or expended funds in the sale or purchase of cocaine. In that regard, the court stated:

... [t]he evidence of record must *at least link the taxpayer with some tax-generating acts,* such as the purchase or sale of the controlled substances.

\* \* \* \* \* \*

[the] mere linking of a taxpayer with the drug business will not suffice and ... the presumption will attach only upon a showing that the taxpayer's involvement was sufficient to support an inference that he received or used funds in the course of his engagement in the unlawful activity. (Emphasis added.)

Id. at 156. *See also Weimerskirch v. C.I.R.*, 596 F.2d 358 (9th Cir.1979); *Carson v. United States*, 560 F.2d 693 (5th Cir. 1977); *Gerardo v. C.I.R.*, 552 F.2d 549 (3d Cir.1977). Recently, in *Anastasato, et al. v. C.I.R.*, T.C.M. (P–H) ¶ 85,101 (T.C. March 6, 1985), the Tax Court assumed, without deciding, that the exception to the presumption rule applies regardless of whether the alleged unreported income is from legal or illegal sources where the Commissioner fails to introduce substantive probative evidence linking the taxpayer to the specific income-tax-generating activity, and the taxpayer challenges the notice of deficiency on the grounds that it was issued arbitrarily.

■ It is against this background and the above cases cited to by the plaintiff that he contends that the defendant's assessment should not be presumed correct because it relied, in justifying the issuance of the jeopardy assessment, almost exclusively on spread sheets by IRS special agents that were based on the unsubstantiated hearsay of Mr. DeMello, a vindictive former business associate of plaintiff. Further, the plaintiff avers that the assessment was arbitrarily and capriciously executed because of the defendant's agent's own concession at trial whereby he reduced plaintiff's income taxes for the taxable year 1980 by $105,914.00. This is true, he contends, when certain expenditures with respect to which Mr. DeMello related to the government, and upon which the jeopardy assessment was based, could not be proven to have emanated from a taxable source. And, based on the evidence adduced at trial, the agent's revised determination yielded a reduction in tax and penalties for 1979 and 1980 in the aggregate net amount of $156,862.50 from the original assessment. Moreover, the plaintiff avers that defendant did not compute the assessment based on plaintiff's correct filing status, *i.e.,* married filing jointly with two exemptions, to which the defendant now concedes the plaintiff is entitled.

Contrastingly, the defendant argues that the naked-assessment cases, relied on by plaintiff, are totally inapposite to this case because certainly there is a wealth of irrefutable evidence "link[ing] the taxpayer with some tax generating acts," *infra.* More importantly, as the defendant notes, the plaintiff's own expert witness at trial even conceded that there were unidentified funds representing adjusted gross income of at least $20,848.59 for 1980, with a related tax liability of $4,632.

It is sufficient to say, in view of this record, that any notion that the naked-assessment cases are applicable here is thor-

oughly misplaced. First, it is indisputable, even by the plaintiff's own testimony, that he owned and operated a supper club in Tulsa, Oklahoma, from 1958 to 1980, a period of 22 consecutive years. Thus, the plaintiff is, without a doubt during the years in issue, linked to a specific income-generating activity with respect to which he failed to maintain books and records and, for the most part, operated exclusively in cash. In fact, the restaurant operation grossed income sufficient to require the plaintiff, by his own stipulation, to file an income tax return, which he did not do, from 1965 to 1978. And, as the plaintiff's own expert testified, the evidence shows that Mr. Tucker had income of $20,848.59 which was taxable in 1980.

Second, at the trial, Mr. Goodwin, the IRS agent responsible for issuing the jeopardy assessment against plaintiff, testified, with regard to the existence of fraud respecting the underpayments for 1979 and 1980, that he based his conclusion on several facts, all of which were supported by substantial documentary evidence introduced at the trial. In that connection, Mr. Goodwin testified that he considered the fact that he found no evidence that the taxpayer filed tax returns for a number of years (and the evidence does show that Mr. Tucker admitted having failed to file income tax returns for the taxable years 1965 to 1980). He also considered, according to his testimony, the fact that monies were being transferred out of the United States by wire transfer. These monies that were being wire transferred were in denominations of $9,999 which indicated an awareness of the $10,000 limitation above which one would be required to file an appropriate federal form for such transfers. *See* 31 C.F.R. § 103.22(a) (1979). With regard to the foregoing, the agent had relevant bank records which indisputably evidenced these multiple wire transfers and cashier's checks at the time he executed the deficiency jeopardy assessment. Such documents were in fact submitted into evidence at the trial.

Third, and finally, Mr. DeMello, the individual responsible for providing the defendant some of the information upon which the assessment was based, did in fact testify at trial, subject to the plaintiff's extensive cross-examination, regarding many of the expenditures and some of the sources of income that the defendant relied on in calculating the jeopardy assessment. *Cf. Dellacroce v. Commissioner*, 83 T.C. 269, 284 (1984). Thus, it is patently clear to this court that the collective evidence supporting defendant's jeopardy assessment, notwithstanding defendant's concessions at the trial, *supra*, was not at all "naked," but rather was supported by substantial creditable and persuasive evidence, documentary and testimonial, most of which was introduced into evidence and connected the plaintiff with an apparent and admitted income-producing supper club business during the taxable years 1958 to 1980. Since the facts upon which the jeopardy assessment was predicated were indubitably rationally based, this court is compelled, at the threshold, to give the Commissioner's determination the benefit of the presumption of correctness. We hold, therefore, that the cases cited to by plaintiff are not on point.

We now address the second issue—as to whether plaintiff has met his burden of proof, by the appropriate quantum (*i.e.*, a preponderance), that the jeopardy assessment was erroneous.

*Plaintiff's Burden—Proof That Expenditures Emanated from Non-Taxable Sources*

Our analysis begins with a fundamental observation of income tax law, and that is—

... [i]t is the duty of the taxpayer to keep books and records of his income for the purpose of determining the correct amount of income taxes due and payable, *and if he fails to do so " * * * the computation shall be made in accordance with such methods as in the opinion of the Commissioner does clearly reflect the income."* ... Our system of taxation of income is grounded upon the basic principle of individual self-as-

sessment in which taxpayers are required to keep records, file returns and compute the tax. *When the taxpayer fails to obey the requirements of the law and maintains no books or records and has no method of accounting, some reasonable basis must be used, and the Commissioner must resort to various sources of information to determine such income and tax liability. In such circumstances the reasonable reconstruction of income by the Commissioner will be presumed correct, with the burden on the taxpayer to disprove such computation even though crude ....* (Emphasis added.)

*Breland v. United States,* 323 F.2d 492, 496 (5th Cir.1963).

This is a classic case in which subject rule is designed to apply. Here, the taxpayer has deliberately and admittedly failed to maintain records over the period 1958 through 1980, and also admitted failing to file a return, when he was required to so do for the period 1965 through 1978. Moreover, the evidence warrants this court to find that plaintiff also failed to file a return for the taxable years 1979 and 1980. The Commissioner has, therefore, properly against this background reconstructed the plaintiff's income, because of his intentional failure to maintain any books and records for the years 1979 and 1980, by using the expenditures method supplemented by the specific item method of proof.[3] The expenditures method of income reconstruction is based on the assumption that the amount by which a taxpayer's expenditures exceed all provable non-taxable sources of funds for the same period, such excess is taxable income. Such non-taxable sources include loans, gifts, inheritances or other assets on hand at the beginning of the taxable period. *See Taglianetti v. United States,* 398 F.2d 558, 562 (1st Cir. 1968), *aff'd,* 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). "The specific item

method [of proof] is, however, direct in its operation. The usual strategy with [this] method is for the Government to produce evidence of the receipt of specific items of reportable income by the [taxpayer] that do not appear on his income tax return or appear in diminished amount." *United States v. Horton,* 526 F.2d 884, 886 (5th Cir.1976), *reh. denied,* 529 F.2d 523, *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976). The Commissioner's determination under these methods is presumptively correct and the plaintiff has the burden of proving, by a preponderance of the evidence, that the determination was erroneous. *Breland,* 323 F.2d at 496.

In the instant case, the plaintiff has not challenged the propriety of the defendant's use of the expenditures method to reconstruct his income for the years at issue. Rather, all that the plaintiff urges on this court is that his expenditures for 1979 and 1980 were derived *totally* from non-taxable sources; thus, for such years, it is argued that he received no reportable income that was taxable. Specifically, the plaintiff contends that in all of 1979 and up until August 1980, he had available to him—cash inherited at his mother's death in 1969 in the amount of $23,634.98 that he hoarded in his home in Tulsa prior to 1979; additional cash of a non-specified amount that he also accumulated from his restaurant operation and hoarded in his home over the years prior to 1979; and cash from an $80,000 loan that he received from Fox Henderson on May 7, 1979. Next, the plaintiff contends that on or about August 20, 1980, his non-taxable funds were further supplemented by a loan in the amount of $75,000 that he received from his brother-in-law, Mr. C.H. Colpitt. With the exception of the Colpitt loan, which is conceded, the defendant contended at the trial that the evidence is fatally deficient respecting the existence of the alleged cash

---

**3.** Section 446(b), Title 26 U.S.C., provides, *inter alia,* "[i]f no method of accounting has been regularly used by the taxpayer, ... the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." Section 6001, Title 26 U.S.C., provides, *inter alia,* that, "[e]very person liable for any tax imposed by this title ... shall keep such records ... make such returns ... as the Secretary may from time to time prescribe."

hoard and the Henderson loan, and did not give credence to either. Moreover, the defendant maintains that an additional $60,000 in cash was brought by the plaintiff to Anguilla in July or August of 1980, which sum also constitutes unreported taxable income of the plaintiff for such year by the specific item method of proof. Each of these alleged sources of non-taxable funds (the pre-1979 cash hoard, and the Henderson and Colpitt loans) will be addressed seriatim by the court, along with the $60,000 specific income item (cash in the attache case).

### (i) Inheritance—1969:

Plaintiff contends, and defendant does not dispute, that in or about 1969 he received $23,634.98 by check as a distribution from his mother's estate. However, in addition, he also urges this court to find, that upon receipt of the inheritance check in 1969, he cashed it and received all one hundred dollar bills (with the exception of some small change) and secreted and hoarded this money in his home, i.e., the supper club, until 1979 for approximately 10 years. And it is further asserted that he did not spend any of said funds until he began to finance his fishing venture in 1979 in Anguilla. Contrastingly, the defendant argues that plaintiff's cash hoard story, that Mr. Tucker did not exhaust his entire inheritance prior to 1979, is incredulous, especially in light of his testimony that he "[q]uite regularly" borrowed money to operate his restaurant, some of which he was unable to pay back, and that he and his wife were living off leftovers from the restaurant. Additionally, the defendant argues that the plaintiff's testimony, that he did not deposit the inheritance in a bank because the interest income was of no importance to him, flies squarely in the face of Mr. Tucker's later action when, in Anguilla, he invested $20,000 in a certificate of deposit when those funds were not immediately needed for its initial purpose of purchasing a fishing boat. As a result of acquiring the certificate of deposit and holding same for several months, plaintiff earned interest in excess of $1,100.

For the reasons expressed below, and premised on the evidence adduced at trial, the court finds that the plaintiff did not have the $23,634.98, which he inherited from his mother, available to him for use after 1978. The court makes this finding based on the following facts and circumstances: At the trial, the plaintiff's brother, Mr. William Tucker, testified that on two occasions while in his brother's home he saw plaintiff's so-called cash hoard consisting of the inherited funds. The first occasion was a few years (1972 or 1973) after the distribution when the plaintiff's home was burglarized and plaintiff called his brother who came over. Despite the burglary, during which his desk was ransacked and its contents were strewn over the floor, including an envelope which contained plaintiff's inheritance, the money was overlooked by the burglars. Plaintiff showed the scene of the burglary to his brother, Mr. William Tucker, who testified that he could not pin down the date that he viewed the funds (i.e., the burglary) but according to the plaintiff's testimony such event either occurred in 1972 or 1973 (Tr. 27, 131).

Mr. William Tucker also could not pin down the precise date of the second occasion he saw plaintiff's cash hoard, except to say that it was in the late 1970's. However, the plaintiff testified that it occurred in approximately 1978 (Tr. 27). At that time, plaintiff's brother testified, he again viewed the plaintiff's cash hoard when he was in the plaintiff's house examining some water damage caused by a leaky roof. The witness testified that his attention was directed by plaintiff to an envelope of money "stashed" in the speaker of his hi-fi. Plaintiff's brother, however, testified that "he did not really have any idea of knowing what the amount of the money was" (Tr. 133). Thus, except for the plaintiff's self-serving testimony, no witness has testified that he saw a hoard of cash in the possession of plaintiff in 1979, the initial tax year here in question. Nor did any witness (excepting plaintiff regarding the $23,634.98 inheritance) testify to a

specific amount of funds viewed as a cash hoard in either 1979 or in any years prior thereto.

Additional evidence warranting an inference that plaintiff had no cash hoard on January 1, 1979, is the fact that the plaintiff testified that after 1970 he borrowed money from several people to help himself out. In fact, in 1974, plaintiff borrowed money to pay off his mortgage and during and thereafter that period he "[q]uite regularly" borrowed money to pay the expenses of the restaurant. Plaintiff admitted that he was unable to repay some of these loans (Tr. 138–141). Mr. Tucker also testified that he and his wife were eating the leftovers from the restaurant and "existing" but not "mak[ing] enough to live on that well" (Tr. 138).

In response to the court's questions as to why he did not deposit his inheritance in the bank where it would be insured and earn interest, especially *after* the restaurant had already been burglarized, Mr. Tucker stated that he chose not to put it in the bank and that the interest on $23,000 for approximately 9 to 10 years was of no importance to him (Tr. 178–180). Yet, as previously explained, this alleged apathy is inconsistent with Mr. Tucker's later action in Anguilla when he invested $20,000 in a certificate of deposit at the Bank of America and earned thereon substantial interest income. Thus, it would strain credulity for this court to find given the foregoing circumstances, and so it does not, that plaintiff had available for use in 1979 and thereafter the funds from the 10-year old inheritance in light of the facts that—(i) no witness other than plaintiff testified to actually *knowing the amount* of the alleged cash hoard as of the end of 1978, and (ii) plaintiff failed to keep the alleged cash hoard safely in a bank, so as to earn interest, while at the same time continuing to borrow funds during this 10-year period. Plaintiff's hospitable cash hoard testimony is especially incredible when the court considers the fact that, given the *non-taxable* nature of the inheritance, he had absolutely no rational reason (at least none was suggested to the court) to "hide" such funds

and the fact that the restaurant had, at least once, been burglarized. *See Gene R. Peters,* 41 T.C.M. (CCH) 955 (1981); *Salladay v. C.I.R.,* T.C.M. (P–H) ¶ 85,086 (T.C. February 26, 1985). This court does not feel compelled to accept plaintiff's testimony even though it appears to be uncontroverted. *Quock Ting v. United States,* 140 U.S. 417, 420–21, 11 S.Ct. 733, 734–35, 35 L.Ed. 501 (1891).

(ii) *Other Accumulated Cash—Unspecified:*

In addition to the inherited funds, plaintiff contends that his aggregate cash hoard also included accumulated profits that he managed to save from income earned prior to 1979 from the operation of his supper club business. The defendant, on the other hand, gave no credence to this contention, arguing that plaintiff has neither stated nor established specifically the amount of any such savings, nor did plaintiff's expert witness include an amount as a source of funds emanating from savings from the operation of the supper club. Furthermore, the defendant argues, plaintiff's contention as to the existence of such a cash-hoard source is at variance with his testimony that he could not make any money at his business (Tr. 31, 138).

For reasons similarly expressed in rejecting plaintiff's so-called inheritance cash hoard argument, *supra,* the court is also unpersuaded that plaintiff has carried his burden of proving, by a preponderance of the evidence, that he had a separate cash hoard from the operation of the restaurant as of December 31, 1978, available for use in 1979 and 1980. The record is clear that plaintiff has proffered no evidence respecting the amount of any such cash hoard or, for that matter, plaintiff has not even presented an estimate or "ballpark" figure of the amount of any such alleged accumulation. Moreover, as previously observed, plaintiff's own expert witness did not factor the alleged non-taxable cash hoard from the operation of the restaurant in his opinion testimony of the amount of Mr. Tucker's net income on the expenditure

basis. Thus, plaintiff's argument is surprisingly unsupported even by his own expert witness's testimony. It is patently clear to this court that such assertion by plaintiff is no more than an afterthought for any unexplained expenditures that might support an inference that they represent gross income. Therefore, the court agrees with the defendant, and finds, that plaintiff failed to prove by a preponderance of the evidence that said so-called "savings" were a source of non-taxable funds available to plaintiff in 1979 and 1980. *See Gene R. Peters,* 41 T.C.M. (CCH) 955 (1981); *Salladay,* T.C.M. (P–H) ¶ 85,086 (T.C. February 26, 1985).

### (iii) *Fox Henderson Loan:*

The remaining source of non-taxable funds that plaintiff avers he had available for use in 1979 through August 1980 was a loan in the amount of $80,000 that he received from Fox Henderson on or about May 4, 1979. Plaintiff testified that the purpose of this loan was to enable him to go into the guest house business in the Caribbean. The defendant argues against the existence of the loan, as a source of plaintiff's Caribbean investment, by stating that at the time plaintiff allegedly received the loan (May 7, 1979), "he had never been to the Caribbean, had no specific plans for any business, and had not even met Mr. DeMello" (since Mr. DeMello testified that he first met the plaintiff the night of his wedding dinner party at Mr. Tucker's supper club in June, 1979).

For those reasons, the investigating revenue agent testified that he did not credit plaintiff with having received the alleged loan, which would have explained the source of expenditures in the amount of $80,000 to have emanated from a non-taxable source. In substance, the agent testified that he could not trace, by any documentary evidence, the proceeds of the alleged loan to and from the plaintiff as the source of any of the specific expenditures

identified in this case, as he could with the Colpitt loan, *infra.*

While there arguably may exist a modicum of documentary evidence from which one, viewing the evidence with tunnel vision, may contend that plaintiff received an $80,000 loan from Henderson in early May 1979, this court is nevertheless constrained to conclude and therefore finds that, viewing the evidence in the aggregate, plaintiff has failed to carry his burden with respect thereto by a preponderance of the evidence. This conclusion is compelled because this court is convinced that once all of the relevant probative evidence is considered, including the credibility of the plaintiff, the collective evidence reasonably supports an inference that the alleged Henderson loan was not in fact made. The evidence supportive of our finding, including contra evidence, is discussed hereinafter.

It is true and the court recognizes, as previously expressed, that the record contains a dearth of indicia of a loan from Mr. Henderson to plaintiff. First, there is a promissory note (Pltf's Ex. 3) dated May 4, 1979, containing plaintiff's handwritten name promising to pay Fox Henderson $80,000, plus 8% interest, due in one year. Second, Mr. Henderson's deposition was read into the record[4] wherein he testified that he made a loan to the plaintiff in 1979, and that a note was executed during the month of May in 1979. Mr. Henderson was not sure if the loan to plaintiff was from him or his company, Crown Construction Company, but he stated that he owned his company 100 percent. Mr. Henderson did not recall knowing, at the time of the loan, specifically why plaintiff needed the money but he testified that he understood the plaintiff used the loan to enter into a venture in Anguilla. Mr. Henderson also stated that he gave plaintiff cash that he obtained from a bank vault at the Republic Bank and Trust Company and that he received a partial repayment of the loan in

---

**4.** Mr. Henderson did not testify at the trial despite the fact that a subpoena was issued because the return of service reported—"after due

search and diligent attempts Fox Daniel Henderson was not found in Tulsa."

the amount of $30,000 on or about July 31, 1981.

In addition to the foregoing, plaintiff introduced into evidence, in further proof of the loan, Plaintiff's Exhibit 58, six cashier's checks drawn on the Republic Bank and Trust, each of which was payable to Fox Henderson, with his closely-held corporation, Crown Construction, as the drawer. Five of the six checks were drawn in the amount of $9,000 each and the sixth was for $35,000, or a total of $80,000. Also each check apparently had been cashed (and processed on May 7, 1981) in that they contained a handwritten endorsement. There is also in evidence only the *face* of a cashier's check dated July 17, 1981, payable to Fox Henderson in the amount of $30,000 with Clinton D. or Dorothy Lee Tucker as drawer. The back of the cashier's check was not offered into evidence by plaintiff to establish the fact that Henderson endorsed the check and to at least lay the predicate for an inference that plaintiff received the loan and that the proceeds from the repayment check were received by Henderson. In fact, no documentary evidence was adduced that establishes that Henderson in fact *received* $30,000 from plaintiff.

Against the foregoing background, and as added indicia of a loan, Mr. Tucker testified at trial that after Mr. Henderson obtained the cash for the loan from the Republic National Bank, he handed the bank bag containing the $80,000 in cash to plaintiff either in the lobby of the bank or in his car. The plaintiff further testified that he then put the $80,000 in a safety deposit box at the *United Bank* within a short time of his receipt of the cash (Tr. 144, 186). However, the Internal Revenue Agent, Jim Goodwin, testified that he went to several banks in Tulsa, including the *United Bank*, to determine if there were savings accounts, checking accounts or safety deposit boxes in the plaintiff's name. At the banks he visited, the agent first inquired if there was banking activity by Mr. Tucker. If there was, he then issued a subpoena for any such records. The agent did not issue any subpoena for the records at the *United Bank* because there was no banking activity by plaintiff in that bank (Tr. 261–263). The agent did, however, locate a safety deposit box at the First National Bank of Jenks. However, at no time did plaintiff testify that he placed the Henderson loan proceeds in a safe deposit box in any bank other than the *United Bank*.[5]

Mr. Tucker testified that he signed an entry card on each occasion that he withdrew funds from the safety deposit box in which he had deposited the $80,000 Hender-

---

5. In fact, when the court inquired of plaintiff relative to the receipt of the alleged Henderson loan and the placement of the proceeds in a safe deposit box at the *United Bank,* the questions and answers were as follows:

Q. Do you recall where you were when you received the $80,000?
A. Almost, Your Honor.... I went to the Republic National Bank with Mr. Henderson. I went into the lobby. Mr. Henderson left with a bank officer. He came back ... with a Republic National Bank sack. He either handed me the sack of money in the lobby or in his vehicle outside. [Tr. 181.]

 * * * * * *

Q. Did he volunteer cash to you?
A. He gave me cash. Now I might have asked him for cash or he might have volunteered it, but I don't remember. [Tr. 182.]

 * * * * * *

Q. Do you recall what the denominations of the $80,000 were?

 * * * * * *

A. They were all hundreds. [Tr. 182–183.]

Q. What did you do with the $80,000?
A. I put it in a safety deposit box. [Tr. 184.]

 * * * * * *

Q. So your testimony is that the entire $80,000 did not stay in the safe deposit box outside of a year?
A. No, sir. By the middle of 1980 I had used nearly all the funds I had.
Q. What bank was this that you deposited the $80,000 in the safe deposit box?
A. The United Bank.
Q. That bank is located where, sir?
A. Essentially 71st and Lewis in Tulsa.

 * * * * * *

Q. Did you sign an entry ticket when you entered your safety deposit box on each occasion after May 1979 at which time you went into your deposit box to withdraw some portion of funds?
A. Yes, Your Honor. It is required by the bank.
Q. You don't have a record of that—a copy of that?
[A.] We don't have[.] (Tr. 185–186.)

son loan proceeds. However, no such entry cards or any bank records were introduced in evidence by plaintiff to prove, the ultimate fact, that he had a safety deposit box at the United Bank in which he could have placed and secured the loan proceeds. Thus, the absence of proof of a safety deposit box at the United Bank in the name of the plaintiff belies the plaintiff's testimony that he received an $80,000 cash loan from Mr. Henderson which plaintiff could have put in said safety deposit box. Had such evidence been adduced, coupled with the other indicia of the Henderson loan, certainly the totality of the evidence would have been significantly more creditable. Surprisingly, the plaintiff failed to adduce this most cogent evidence. It is axiomatic, therefore, that where a party fails to introduce evidence within his ability to produce, such failure gives rise to an inference that the evidence, if produced, would be unfavorable to the party's position in the litigation. *Estate of Mabel Lloyd Ridgely v. United States,* 180 Ct.Cl. 1220, 1231 n. 5 (1967). The criticality of such omission is underscored by the fact that plaintiff has failed to establish, by one scintilla of documentary evidence, a significant traceable connection from the cashing of the Henderson checks by Henderson to plaintiff's receipt and possession of the proceeds thereof. Additionally, and assuming arguendo a safety deposit box at the United Bank, plaintiff has also failed to specifically connect the alleged $80,000 proceeds in said putative safety deposit box to specific monetary transfers to Anguilla (similar to the manner in which the Colpitt loan proceeds have been so traced, *infra*).

Also, with regard to the alleged $30,000 repayment to Henderson, *supra*, the plaintiff only introduced into evidence the *face* of the cashier's check and not the back. Thus there is no documentary evidence in the record establishing the fact that Mr. Henderson actually endorsed and negotiated the $30,000 cashier's check (see Pltf's Ex. 4). Again, plaintiff's failure to introduce this evidence causes this court to conclude that such evidence, if produced, would have been unfavorable to him. *Id.*

Hence, as the Tax Court has stated on facts quite analogous to those presented herein, where the court rejected the existence of a loan between the taxpayer and his father because a direct link was missing:

> *[W]e are not bound to accept as gospel petitioner's testimony* (or that of his father), *even though it was not directly contradicted; we are entitled to take into account whether the testimony is improbable, unreasonable, or questionable. Quock Ting v. United States,* 140 U.S. 417, 420–21 [11 S.Ct. 733, 734–35, 35 L.Ed. 501] (1891); *Leong v. Commissioner,* T.C. Memo. 1977–19, affd. without published opinion 573 F.2d 1291 (2d Cir.1977). *Nor are we bound to conclude that the loan was made merely because a note and receipts ... were executed; we think the note and the receipts were mere window dressing. Transamerica Ins. Co. v. Womack, Inc.* (E.D.Va.1972, 31 AFTR 2d 73–471, 73–1 USTC par. 9146), affd. per curiam (4th Cir.1974, 33 AFTR 2d 74–999, 74–1 USTC par. 9326). (Emphasis added.)

*D.W. Green v. C.I.R.,* 47 T.C.M. (CCH) 1016 (1984). *See also Mills v. C.I.R.,* 399 F.2d 744, 749 (4th Cir.1968); *United States v. Hemphill,* 78–1 U.S.T.C. ¶ 9429; *Russell A. Bufalino v. Commissioner,* 35 T.C.M. (CCH) 494, 500 (1976).

Similarly, in this case we are disinclined to "accept as gospel" the testimony of Messrs. Tucker and Henderson because the collective creditable evidence leads us to believe that the alleged loan is improbable and questionable since we are also convinced that the probative evidence adduced, *supra*, is also "mere window dressing." We are dubious as to the existence of said loan because of, but not limited to, the following facts and circumstances:

(i) it is most unlikely that a non-relative would loan $80,000 *totally unsecured*, given plaintiff's business and financial history;

(ii) it is most peculiar that Henderson would draw checks (cashier's) to *his* order on his *closely-held* corporation, endorse

and cash same and then give the $80,000 in cash to plaintiff. Logic would compel any reasonable business man to simply draw a check to the order of the *borrower* to evidence the initial step, *i.e.*, transfer of the proceeds of the loan;

(iii) Henderson did not appear to testify at the trial in that the marshall's return of service indicated that he could not be found;

(iv) plaintiff's failure to introduce bank entry signature cards with regard to his alleged safety deposit box at the United Bank establishing the fact of the rental of a box in 1979 and 1980, and multiple entries coinciding with expenditures in 1979 and 1980 which the Service contends are taxable funds (particularly inasmuch as no evidence was proffered to the effect that such entry signature card(s) were unavailable);

(v) the improbability that a person would borrow $80,000 and permit it to sit totally idle for approximately five months (and permit portions of it to sit idle for approximately 7 to 14 months on a worse-case scenario and 6 to 8 months on a best-case scenario), with 8% interest accruing without putting it in an interest-bearing account; and

(vi) finally, where one seeks to prove repayment of a loan by check, one would not introduce into evidence only the face of the check. (Pltf's Ex. 4.) One would also offer the back of the check to prove that it was endorsed and negotiated as a predicate for inferring receipt of the proceeds thereof. Plaintiff's failure is most strange, particularly whereas in the Colpitt loan he included the back of the check to prove his endorsement. See Pltf's Exs. 6 and 9. Also see Pltf's Ex. 58, Crown Construction's checks to the order of Henderson.

After thoroughly reviewing all of the evidence and evaluating the credibility of Mr. Tucker, we are not persuaded that plaintiff has proven by a preponderance of the evidence that he received an $80,000 loan in cash in May of 1979 from Mr.

Henderson. Because of such failure, we find that the Service was correct in its refusal to credit certain expenditures in 1979 and 1980 in the aggregate amount of $80,000 as emanating from a non-taxable source.

*(iv) Colpitt Loan:*

From about August 20, 1980, to the end of December 1980, the plaintiff contends that the source of $75,000 of his remaining 1980 expenditures was funded by a loan of $75,000 that he received from his brother-in-law, C.H. Colpitt. The defendant acknowledges and effectively concedes this loan as a non-taxable source of money expended by the plaintiff during the taxable year 1980. (See Defendant's Exhibit 11.)

The court agrees with both parties that the evidence is sufficiently probative to find that the Colpitt loan existed and notes that the proof supportive of said loan is markedly distinguishable from the proof of the Henderson loan because the funds from Colpitt to plaintiff can be specifically traced by documentary evidence in the record. Mr. Tucker and Mr. Colpitt both testified that in August of 1980 plaintiff borrowed $75,000 from the latter. Evidence supporting said loan were two promissory notes each dated August 20, 1980, one for $50,000 and the other for $25,000, payable on demand at 8% interest to C.H. Colpitt by C.D. Tucker.[6] Unlike the cash proceeds used to effect the alleged Henderson loan, Mr. Colpitt gave plaintiff two checks, payable to the order of C.D. Tucker dated August 20, 1980, in the amount of $50,000 and $25,000 respectively. The backs of each of these checks show that plaintiff endorsed them at the Union National Bank, the drawee, on August 20, 1980 (Pltf's Exs. 6, 9). Then, the record subsequently reflects that the plaintiff purchased eight cashier's checks from the Union National Bank payable to the order of C.D. Tucker. Seven of the eight checks were for $9,999 each and the eighth check was in the amount of $5,000, which totalled to $74,999. (See Pltf's Exs. 28–32, 46, and

---

**6.** Neither of the notes received in evidence without objections of defendant was signed by plain-tiff (Pltf's Exs. 5, 8). However, Colpitt testified that the original was signed (Tr. 117).

Deft's Exs. 4, 5, 7.) Defendant's Exhibit 6 shows that the checks numbered 46217 and 46213 for $9,999 each were deposited on September 8, 1980, into the Anguilla Sea Products account at the Caribbean Commercial Bank in Anguilla, West Indies. Four of said checks for $9,999 each and numbered 46211, 46214–46216 were deposited on September 8, 1980, to Carlos DeMello's account at the Caribbean Commercial Bank (Deft's Ex. 7). The bank account that plaintiff maintained at the Bank of America in the name of Merit Leasing reflected a deposit of $16,899 on September 16, 1980, with respect to which plaintiff testified that approximately $15,000 represented the deposit of the remaining two cashier's checks for $10,000 and $5,000 respectively (Tr. 76 and Pltf's Ex. 46). Lastly, the evidence also shows the face of a cashier's check dated July 18, 1981, payable to C.H. Colpitt for $50,000 from Clinton or Dorothy Lee Tucker, which plaintiff testified represented a partial repayment of the Colpitt loan.

Since the Colpitt loan proceeds can be traced from checks drawn by Mr. Colpitt directly to Mr. Tucker and from the latter directly to deposits made into Anguillan banks, the court is convinced that the evidence is sufficiently probative to find that the plaintiff has satisfied his burden of proving, by a preponderance of the evidence, that he received in August 1980 a $75,000 loan from his brother-in-law, C.H. Colpitt.

*$60,000 Cash in Attache Case*

Solely on the testimony of Carlos DeMello, the defendant attributes $60,000 in cash, allegedly possessed by plaintiff in 1980 in an attache case, as taxable income to plaintiff in the taxable year 1980. Specifically, Mr. DeMello testified that on the plaintiff's final trip to Anguilla, before permanently moving there, plaintiff "came in with a substantial amount of cash in his black attache case." This event occurred approximately in July or August of 1980 at the airport in St. Martin where the two men stayed over night because of an airplane delay. Mr. DeMello testified that he and plaintiff were discussing putting the attache case in an airport locker when Mr. Tucker showed him the cash in the attache case and said that "it was over $60,000." Mr. DeMello stated that he could not tell how much was in the case because he and plaintiff only "glanced through it." (Tr. 348–349.)

However, Mr. DeMello did testify that the briefcase was a "normal attache case" in which he saw "hundred dollar bills" and that the case was "full." And, Mr. DeMello stated that he did not count the money because he only saw the top row of it. Finally, Mr. DeMello testified that he did not know where the cash and/or attache case ended up after plaintiff put it in the airport locker. (Tr. 382–384.)

Mr. Tucker, on the other hand, testified that in either August or September of 1980 he took a brown attache case to Anguilla but he "had no money in it." (Tr. 462.) The plaintiff argues that Mr. DeMello's testimony should not be given any credence because he is not a credible witness. First, the plaintiff stresses that Mr. DeMello is a vindictive ex-business associate of his because plaintiff had caused Mr. DeMello to be incarcerated for approximately two weeks over an alleged debt dispute in the Caribbean, and within two days after Mr. DeMello was released from jail he went to Tulsa with records of Anguilla Sea Products, Ltd. to talk to special agents of the Internal Revenue Service. Second, the plaintiff contends, as shown through the defendant's summary witness, that $60,000 in one-hundred dollar bills would not have filled even ten percent of a briefcase that Mr. DeMello testified was full. Third, plaintiff argues that Mr. DeMello's testimony is inconsistent with the fact that less than 30 days before the alleged incident the plaintiff borrowed $75,000 from his brother-in-law. Fourth, the plaintiff avers that defendant has only selected a portion of Mr. DeMello's original testimony to the Internal Revenue Service to include as income; that is, the defendant did not go forward at trial with $40,000 in certificates of deposit and a second jeep of which Mr.

DeMello told the special agent. (The inference suggested is that the defendant did not include the said certificates of deposit and the second jeep because there was no proof and the same treatment is appropriate regarding the $60,000 for the same reason(s).)

Contrastingly, the defendant contends that plaintiff's bland denial is not worthy of belief and that the incident, $60,000 in a black attache case, was simply a component of the plaintiff's grand scheme to surreptitiously take money out of the country without being detected. Moreover, the defendant argues that plaintiff's testimony on this issue is no more credible than his testimony was about his cash hoard.

In deciding whether or not the operative facts support a finding that plaintiff brought $60,000 in cash to Anguilla on or about August 1980, it must be kept in mind that the Commissioner's determination is presumptively correct and it is the plaintiff's burden to show by a preponderance of the evidence that this determination is incorrect. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *United States v. Janis*, 428 U.S. 433, 440, 96 S.Ct. 3021, 3025, 49 L.Ed.2d 1046 (1976). With respect to the threshold question as to where plaintiff obtained the $60,000 in cash in 1980, given his self-serving testimony regarding the low profitability of the supper club business, it is clear that it is not the defendant's burden to so show. Even assuming arguendo that the defendant must go forward with the evidence on this issue, which it does not until such time as plaintiff rebuts the presumption with creditable evidence, all that it would be required to establish is a likely source from which such income could have emanated, and not the specific source. Since proof of a likely source (*i.e.*, plaintiff's supper club business which also provided entertainment) from which the court could find that the $60,000 in cash evolved, would be sufficient in a criminal case, *a fortiori*, it is

sufficient in a civil fraud case. *Holland v. United States*, 348 U.S. 121, 138, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954). We view the statement made by plaintiff, as testified to by Mr. DeMello, that plaintiff had $60,000 in cash in the attache case, to be an admission against his interest that plaintiff would not have made unless it were true. Because the plaintiff categorically denies bringing the $60,000 in cash to Anguilla in 1980, the testimony of plaintiff and Mr. DeMello are diametrically opposed to each other. Thus, the question becomes one of credibility for the court to decide given the obvious fact that one of them did not testify truthfully on this issue. *Markham v. Holt*, 409 F.2d 542, 544 (5th Cir.1969); *State of Louisiana, et al. v. M/V Testbank*, 564 F.Supp. 729, 734 (E.D.La.1983).

While it is arguable that Mr. DeMello had a motive to fabricate the $60,000 cash in the attache case, so as to obtain revenge from plaintiff for causing him to be incarcerated in connection with an alleged debt, the plaintiff obviously has a more vexing motive. That is, plaintiff not only seeks the refund of the tax on the $60,000 plus the 50% fraud penalty thereon and deficiency interest that he paid the IRS under the jeopardy assessment, he also seeks the refund of the entire $272,147.97 in taxes, penalties, and interest assessed. Though plaintiff vigorously attempted to impeach Mr. DeMello, by asserting various innuendos, including, but not limited to, the contention that he had been or was presently under investigation by United States authorities because he was allegedly connected with the sale of illegal arms, the fact is that there is not one scintilla of evidence in the record that Mr. DeMello has ever been indicted or convicted of any crime in the United States (or in any other jurisdiction). While it might be true, as plaintiff contends, that Mr. DeMello may have had several "brushes" with the law, nothing is contained in the record that would lead this court to conclude that he is unworthy of belief.[7] Mr. DeMello, although beyond the

7. As testified to by Mr. DeMello, his background is as follows: He was born in Brazil in 1934 into a family of politicians. His father was Secretary of Education and Chairman of the Board of the National Theatre, and one of the biggest Shakespeareans of Latin America. His uncle

reach of a United States subpoena, voluntarily came to the United States and testified in this case subject to the pains and penalties of perjury, if he were proven to have testified falsely. It does not appear that he had anything to gain monetarily or materially by not testifying truthfully. On this record, this court sees no significant motive in Mr. DeMello to obtain revenge by testifying falsely. Even assuming that revenge was his intent, *ab initio*, by cooperating with the Internal Revenue Service in 1981, the exposure of Mr. Tucker to the investigation by the special agent (*i.e.*, a potential criminal investigation) was probably more emotionally traumatic and grievous to plaintiff than the loss of several thousands of dollars would be. Thus, it appears to this court that Mr. DeMello obtained his "pound of flesh," if that was his objective, *prior* to the trial of this case by causing a criminal investigation of plaintiff. In any event, this court is aware of no evidence that existed at the time Mr. DeMello testified that would contaminate the believability of his testimony.

Despite plaintiff's vigorous attempt to discredit the testimony of Mr. DeMello by demonstrating that a briefcase filled with one hundred dollar bills, totalling to $60,000, would only take up approximately ten percent of the space therein and would not be "full" as DeMello testified, the truth is that the record reflects that Mr. DeMello did not testify as to how the bills were *arranged* in plaintiff's attache case. Mr. DeMello simply testified that he glanced at it and only just saw the top row. The court agrees with Mr. Goodwin's observation at the trial that "[t]here could have been something underneath the bills." (Tr. 431.) Additionally, the fact that plaintiff borrowed $75,000 from his brother-in-law at or near the time plaintiff brought the $60,000 into Anguilla is not, as plaintiff argues, inconsistent, given plaintiff's testimony

that he "[q]uite regularly" borrowed money. The plaintiff admittedly dealt exclusively with cash and thus carrying cash is quite consistent with plaintiff's proclivities. Finally, the fact that the Commissioner was not satisfied with the sufficiency of the evidence with respect to all of the items of which Mr. DeMello originally informed the IRS special agent, and therefore did not charge plaintiff with such income, does not mean, as plaintiff would urge on this court, that Mr. DeMello lied at trial about the existence of the $60,000 as admitted to Mr. DeMello by plaintiff, or that the Commissioner's determination based on Mr. DeMello's testimony is not presumptively correct. Plaintiff's shortfall here is that he has not overcome the fact that "... [t]he burden is with the taxpayer to show, with respect to each item, that the Commissioner was wrong in his determination." *Hoffman v. C.I.R.*, 298 F.2d 784, 788 (3d Cir.1962). In *Hoffman*, the court stated that:

> ... it has long been recognized that where error has been shown by the taxpayer which does not affect the entire deficiency but only a separate part of it and if error does not reveal a careless or arbitrary attitude on the part of the Commissioner, then the presumption of correctness remains with the other items composing the deficiency determination.

*Id.* Contrary to plaintiff's contention, this court is of the opinion that the evidence here requires the finding that such conduct (excluding items from income where the evidence was weak) by the Commissioner demonstrated an attitude of reasonableness and carefulness rather than one of arbitrariness as urged by plaintiff.

In determining whether plaintiff would have been motivated to testify less than truthful with regard to his possession of the $60,000 cash in the attache, this court has considered his demeanor on the stand as well as the background facts in this

---

was the leader of the Brazilian Congress and his grandfather was founder of the first Brazilian newspaper. DeMello attended the University of Louisiana, the University of Tulsa, and the University of Southern California, where he graduated with a degree in petroleum engineering.

He has worked as a geologist in Brazil, as an assistant manager and a general manager in banks in London and Anguilla, West Indies, respectively; he also has run a company he started which was in the business of reclaiming lubricating oil.

case. In this connection, we observe that the evidence in the record portrays plaintiff as a man with an insatiable appetite to conceal and mislead the government ·with respect to his income and deductions. As an example, for 15 consecutive years (1965 through 1980), Mr. Tucker did not file an income tax return even though he admits his gross income was sufficient to require him to file an income tax return for 13 of those 15 years. Moreover, plaintiff maintained no business records relating to the operation of his restaurant, despite the legal requirement that tax returns and records are, respectively, required to be filed and kept. 26 U.S.C. § 6001 (1982). Besides, plaintiff admittedly dealt exclusively in cash, maintaining no checking account and negotiating checks payable to himself over to third parties.

With respect to the possible source(s) of the $60,000 in cash, on this record and given the bent of taxpayer, we believe that the evidence as a whole may be said to reasonably support an inference that the $60,000 "likely" emanated (in whole or in part) from the sale of the restaurant assets by plaintiff for *cash* in July or August of 1980, and/or from the operation of the supper club. Such assets included, but were not limited to, a grand piano, kitchen equipment, chairs, a phone booth, and miscellaneous inventory (Tr. 66). Since plaintiff introduced no evidence as to the amount of the proceeds received from the sale of said assets or the net gain therefrom, this court can only presume that such evidence, if submitted, would have been unfavorable to plaintiff's position in this lawsuit. *Estate of Mabel Lloyd Ridgely v. United States*, 180 Ct.Cl. at 1231 n. 5 (1967).

Finally, although plaintiff listed in his pretrial submission that he would call Mrs. Tucker as a rebuttal witness to Mr. DeMello's testimony, she was not called to testify at the trial, from which the court can only draw a negative inference (regarding the $60,000 cash in the attache case) in view of her intimately close relationship with plaintiff. *Id.; Hageny v. United States*, 215 Ct.Cl. 412, 440, 570 F.2d 924, 936 (1978).

Given the foregoing facts and circumstances bearing on the credibility of plaintiff and Mr. DeMello, and having judged the demeanor of each, the court finds Mr. DeMello to be creditable and sees no valid basis for discounting his testimony as unworthy of belief. On the other hand, the evidence as discussed, *supra*, leads this court to conclude that plaintiff was highly motivated to testify so as to assure the refund of the entire amount claimed. For example, when the court notes the number of instances (approximately 110) in which plaintiff responded—I don't remember or I don't recall—to a question, one could reasonably be left with the distinct impression that he might have engaged in selective amnesia.

Since plaintiff failed to overcome the presumption of the correctness of the Commissioner's determination and prove by a preponderance of the evidence that the inclusion of the $60,000 in cash as income is error, the court finds, therefore, that plaintiff did in fact have $60,000 in the attache case which was income to him in 1980 from one or both of the likely sources, *supra*.

*Fraud*

 Turning to the final issue presented, 26 U.S.C. § 6653(b)(1) provides that if an underpayment in income taxes is due to fraud, "there shall be added to the tax [due] an amount equal to 50% of the underpayment." This 50% addition to the tax in the case of fraud is a civil sanction "provided primarily as a safeguard for the protection of revenue and to reimburse the Government for the heavy expenses incurred as a result of investigations and the loss resulting from the taxpayer's fraud." *Helvering v. Mitchell*, 303 U.S. 391, 401, 58 S.Ct. 630, 634, 82 L.Ed. 917 (1938). As stated by the Court of Claims, "[t]he term 'fraud,' as used in the statutory provisions authorizing the assessment of civil fraud penalties against taxpayers, means intentional wrong doing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing." *Irolla v. United States*, 182 Ct.Cl. 775, 779,

390 F.2d 951, 953 (1968). The question of fraud is one of fact and the government has the burden of proving fraud against the taxpayer by means of clear and convincing evidence. 182 Ct.Cl. 778–79, 390 F.2d at 953.

 The government's burden is often a difficult one because the state of the taxpayer's mind, a subjective condition, is crucial in determining the existence or absence of the essential element of fraudulent intent. 182 Ct.Cl. 779, 390 F.2d at 953. However, the government may meet its burden of proof on the issue of fraud by using circumstantial evidence. 182 Ct.Cl. at 779, 390 F.2d at 953–54. In this connection, the taxpayer's entire course of conduct may establish the requisite fraudulent intent. *Stone v. Commissioner,* 56 T.C. 213, 224 (1971); *Otsuki v. Commissioner,* 53 T.C. 96, 106 (1969). The failure to file tax returns, without more, is not proof of fraud. *Stoltzfus v. United States,* 398 F.2d 1002, 1005 (3d Cir.1968), *cert. denied,* 393 U.S. 1020, 89 S.Ct. 627, 21 L.Ed.2d 565 (1969). But the failure to file returns for an extended period is "persuasive evidence" of an intent to defraud the government. *Id.* at 1005. A pattern of non-filing, when coupled with affirmative evidence of an intent to defraud, warrants the imposition of the fraud penalty. *Id. Goodman v. C.I.R.,* T.C.M. (P–H) ¶ 85,151 (T.C. March 28, 1985). Also, courts have held that indicia of fraud includes the failure to furnish books and records. *Lollis v. C.I.R.,* 595 F.2d 1189, 1192 (9th Cir.1979).

 In light of these legal principles, we now examine the evidence to determine if the defendant has carried its burden of proving, by clear and convincing evidence, that Mr. Tucker fraudulently intended to evade his income taxes for the taxable years 1979 and 1980, and conclude that he has.

For 15 years, from 1965 through 1980, Mr. Tucker continuously failed to file an income tax return despite his own stipulation that his gross income was sufficient to require him to do so for 13 of those years, and the evidence so shows for the remaining two, *i.e.,* 1979 and 1980. The plaintiff has offered this court absolutely no plausible explanation as to why he failed to file a tax return for 15 years, and in particular for 1979 and 1980. Though required by law, the plaintiff maintained no books and records for that period. Furthermore, plaintiff operated exclusively in cash and maintained neither a personal checking nor a savings account. Nor did he maintain a business checking account to pay the bills of his restaurant business for any years in issue.[8] To the extent checks were given to plaintiff, he admittedly negotiated them over to third parties, rather than depositing them into a bank account. Plaintiff's attempts to transfer funds out of the country undetected by using the name of his alter ego, Merit Leasing, Ltd., rather than his own name, are cogent evidence of fraud. Also probative of the ultimate fact is plaintiff's admission to the court that Merit Leasing, Ltd. served no significant business purpose. Finally, plaintiff forwarded funds to his business partner, Mr. DeMello, in New York or Florida to be transferred to Anguilla in amounts slightly below $10,000 so as to avoid the banking reporting requirements. *See* 31 C.F.R. § 103.22(a) (1979). All of the foregoing factors, taken together, illustrate clearly and convincingly that plaintiff's entire underpayment of income taxes for the taxable years 1979 and 1980 were due to fraud, and we so find.

## CONCLUSION

Given the foregoing opinion, plaintiff is entitled to a partial income tax refund for the taxable year 1980 only. Inasmuch as a detailed tax, penalty, and interest calculation is required before this court can enter an appropriate judgment in favor of plaintiff, the court HEREBY issues a Call on the Internal Revenue Service, pursuant to RUSCC 34(d)(1)(B) and 28 U.S.C. § 2507(a), for a calculation of the precise taxes, inter-

---

**8.** At Tr. 137 plaintiff testified that he maintained two bank accounts "but they were never used. They were both dormant accounts. Neither of them had over $1,000 or $2,000 in them."

est, and penalties for which the plaintiff is obligated regarding each of the taxable years 1979 and 1980, as well as the refund due plaintiff (including taxes, penalty, and interest), consistent with this opinion, for the taxable year 1980. Said Call *shall* be filed in this court no later than 30 days from the date of this opinion.

IT IS SO ORDERED.

## ATTACHMENT A

| | | Expenditures | |
|---|---|---|---|
| Date | Exhibit No. | 1979 | 1980 |
| 10/11/79 | 13 | $ 9,500.00 | |
| 10/11/79 | 14 | 9,500.00 | |
| 11/28/79 | 16 & 17 | 4,993.10 | |
| 12/17/79 | 19 & 20 | 4,993.10 | |
| 1/6/80 | Tr. 43 | | $ 20,000.00 |
| 1/23/80 | 22 | | 9,999.00 |
| 1/24/80 | 23 | | 9,999.00 |
| 1/25/80 | 24 | | 9,999.00 |
| 2/14/80 | 25 | | 7,000.00 |
| 7/14/80 | 26 | | 8,000.00 |
| 8/14/80 | 27 | | 12,000.00 |
| 8/20/80 | 4 & 7 | | 9,999.00 |
| 8/20/80 | 28 | | 9,999.00 |
| 8/20/80 | 29 | | 9,999.00 |
| 8/20/80 | 30 | | 9,999.00 |
| 8/20/80 | 31 | | 9,999.00 |
| 8/20/80 | 32 | | 9,999.00 |
| 9/16/80 | 5 & 46 | | 16,899.00 |
| 8/21/80 | 2 & 3 | | 7,000.00 |
| 10/6/80 | Tr. 62 | | 8,500.00 |
| 11/30/80 | 48 | | 1,107.38 |

| | 1979 | 1980 |
|---|---|---|
| 1979 Corrected-Unreported Income | $28,986.20 | |
| Gross Expenditures | | $170,497.38 |
| Less: Loan — Colpitt | | (75,000.00) |
| Income based on expenditures and miscellaneous interest | | $ 95,497.38* |
| (i) Expenditures | $94,390.00 | |
| (ii) Interest income | $ 1,107.38 | |
| | $95,497.38* | |
| Plus: Income (cash in attache) | | 60,000.00 |
| 1980 Corrected-Unreported Income | | $155,497.38 |